IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 4:08-CR-454 |
| | : | |
| v. | : | (Judge McClure) |
| | : | |
| LEVI DANIEL MORALES-RUIZ, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

November 2, 2009

**BACKGROUND:**

On December 11, 2008, a Grand Jury sitting in the Middle District of

Pennsylvania handed down a three-count indictment against the defendant. On

April 23, 2009, a four-count superseding indictment was returned charging the

defendant, Levi Daniel Morales-Ruiz, with Distribution of a Controlled Substance

(Count I), Possession of a Firearm by an Illegal Alien (Count II), Possession of a

Firearm During a Drug Trafficking Crime (Count III), and Criminal Forfeiture

(Count IV). Upon motion of the government, on July 2, 2009, this Court ordered

the dismissal of Count IV from the indictment. As a result, only Counts I through

III are currently pending against the defendant.

The defense filed a "Motion to Suppress Evidence and Dismiss the

Indictment" and a supporting brief. (Rec. Doc. Nos. 29 and 30). We suspended

further briefing, and held a suppression hearing on August 19, 2009. As a result of the hearing, the government filed an opposing brief on September 24, 2009. (Rec. Doc. No. 69). Defendant filed a reply brief on October 13, 2009. (Rec. Doc. No. 73).

Now, therefore, for the following reasons we will deny the "Motion to Suppress Evidence and Dismiss the Indictment."

**STATEMENT OF FACTS:**

On August 19, 2009, an evidentiary hearing was held. Pennsylvania State Troopers Jesse Moyer and Derek Pacella testified. The court found the testimony of both troopers to be credible. Troopers Moyer and Pacella were the troopers at the scene on the day in question.

The facts are taken from the testimony presented at the evidentiary hearing.[1] On November 5, 2008, Troopers Moyer and Pacella were patrolling Interstate Route 80 on "SHIELD" detail. SHIELD stands for Safe Highways Initiative Through Effective Law Enforcement and Detection. Trooper Moyer was driving the squad car and Trooper Pacella was the recorder.

------

[1]Additionally, parts of the encounter between the troopers and the defendant were videotaped through a camera in the patrol car. The video was admitted into evidence and portions of it were viewed in open court. There was no sound element to the video; it was only visual.

At around 1:30 p.m., the troopers observed a disabled vehicle in the center median of Route 80, at approximately mile marker 167 in Centre County. The hood of the vehicle, a red Kia Sportage, was raised as was the vehicle's end gate. Trooper Moyer testified that the driver's side door may have been open as well, but he could not recollect with certainty that that was the case. Trooper Moyer could see a male standing outside the vehicle near the engine, apparently attempting to get the vehicle running. The male standing with the vehicle was the defendant, Levi Daniel Morales-Ruiz.

The troopers activated the lights on their patrol car for safety reasons and pulled into the center median behind defendant's vehicle. Trooper Pacella called in the traffic stop as Trooper Moyer exited the squad car to assist the defendant. Trooper Moyer attempted to ask the defendant what the problem was with the vehicle, but the language barrier was apparent immediately. The defendant pointed to the engine and was able to communicate that the radiator may have overheated, as he was carrying a jug of water.

Trooper Moyer then asked, as he does in every encounter, for identification: license, registration, and insurance. Trooper Moyer stated that it is required for him to request identification in every case, including all disabled motorists. Trooper Moyer testified that when he asked the defendant for

identification, the defendant became very nervous, looked at the ground and replied that he did not have any identification. When pressed, the defendant produced a Nicaraguan identification card.

At this point, Trooper Pacella walked over and joined the conversation. Trooper Pacella was better versed in Spanish, so he took over the dialogue. Trooper Pacella asked the defendant if he had a passport, a driver's license, an international driver's license, a visa, registration, or an insurance card. The defendant was not able to produce these documents. The defendant conveyed to Trooper Pacella that he had overstayed his visa by three months. These responses caused Trooper Moyer to suspect that the defendant was in the country illegally. Trooper Pacella asked the defendant if he was in the United States legally. The defendant smiled and looked at the ground. Trooper Moyer became concerned that the defendant was so nervous that he would run. Trooper Moyer felt this way because the defendant seemed to scan the area looking for an exit route.

On cross-examination, Trooper Moyer acknowledged that the defendant was not free to leave because he had not yet produced anything showing that he could legally drive on Pennsylvania roadways. Trooper Moyer also indicated that the defendant eventually produced a registration card for the vehicle, but the registration was not in the defendant's name. Trooper Pacella testified that, when

he called in the traffic stop, he learned the vehicle was not registered to the defendant. It is not clear from the testimony if the troopers learned the car was registered to someone other than the defendant because the defendant did produce a registration card or because Trooper Pacella had called in the license plate. It is also not clear from the testimony at what point the defendant produced each of these items and at what point the Trooper felt defendant was not free to leave. It is clear from the testimony that when the defendant was asked if he was in the country legally he had not yet been Mirandized.

Trooper Pacella told the defendant that he would be detained and taken to the station to be "Live Scanned."[2] Trooper Moyer testified that live scanning is the most reliable method of determining someone's identity for purposes of nationality; it can only be done in the barracks, not in the squad car. The defendant put his hands behind his back, Trooper Pacella handcuffed the defendant, and the defendant was placed in custody and seated in the rear of the patrol car.

Because the defendant was unable to provide any documents, other than his Nicaraguan ID card, regarding his identity, and because he admitted that he had overstayed his visa by three months, Trooper Pacella was suspicious that the

---

[2] "Live Scanning" is a process by which an individual's fingerprints are recorded. Through this process, the authorities are able to identify the individual's immigration status and whether the individual had ever been fingerprinted before.

defendant was in the United States illegally. While in the vehicle with the defendant, Trooper Pacella telephoned Immigration and Customs Enforcement ("ICE") to attempt to determine the defendant's immigration status. Trooper Moyer testified that the defendant would not have been released until they determined if the defendant was an illegal alien.

The troopers decided that it would not be safe for the vehicle to remain in its position in the center median of Route 80, so they decided to have it towed. Trooper Pacella remained with the defendant in the patrol car.

Trooper Moyer returned to defendant's vehicle to secure the vehicle and to conduct an inventory search prior to the tow truck's arrival. Securing the vehicle involves physically rolling all windows up, locking all doors, and obtaining the keys. An inventory search is also undertaken so that anything of value, such as money, wallets, jewelry, etc., is taken out of the vehicle before the vehicle is sent with the tow truck to a tow lot. If any items of value are found by the troopers inside a vehicle, those items are logged in a property record and stored at the state police barracks until the owner can retrieve them.

At this point in the encounter, the passenger side front-door of the vehicle was open because the defendant had opened it while looking for his identification card. Trooper Moyer began to secure the vehicle through the passenger side front-

door.  According to Trooper Moyer, the vehicle was "an absolute mess."  Trash and clothes were strewn throughout the vehicle, and clothes were stacked as high as the back seats.  Trooper Moyer could see a black handgrip of a pistol between the driver's seat and the center console.  The front part of the pistol, also known as the slide, was covered by a pair of bloody underwear.  Trooper Moyer attempted to secure the firearm by ejecting the clip.  However, he was unable to eject the clip and gave the firearm to Trooper Pacella to eject the clip.  Trooper Pacella was able to successfully eject the clip.

Trooper Pacella testified that the firearm "took it to the next level." According to Trooper Pacella, the situation began as a motorist assist, moved to an investigatory detention of a suspected illegal, and concluded as a custodial arrest for a possible firearms charge.  Therefore, Trooper Pacella Mirandized the defendant using a pre-printed <u>Miranda</u> warning card that contained the warning written in Spanish.  Trooper Pacella asked the defendant in Spanish if he understood, and the defendant acknowledged that he did.  At some point, the defendant said in English that he was "a deadman."  Trooper Pacella testified that he was not sure if the defendant said this before being Mirandized or after. Trooper Pacella then asked the defendant if there were any additional firearms in the vehicle.  The defendant indicated that there were not.  The defendant explained

that he had been in a fight and the gun was for his protection.   The defendant also said in Spanish, "hielo," which Trooper Pacella later learned means "ice."  The defendant said "crystal" in English, so Trooper Pacella asked if he was referring to methamphetamine.  The defendant responded by chuckling.  Trooper Pacella also asked if the defendant had any money in the vehicle or on his person, and the defendant responded that he had a little bit, though not in large amounts.   The defendant used the word "attorney," and at that point Trooper Pacella ceased questioning the defendant.

Trooper Moyer saw blood not only on the underwear, but also on other garments in the vehicle.  In light of the presence of blood, Trooper Moyer looked though the stack of clothes in the backseat of the vehicle to ensure that a body was not hidden under the clothes.  Finding nothing of value in the backseat, Trooper Moyer moved to check the cargo area of the hatchback vehicle.  He saw nothing of value in the trunk area, though he did not remove or open any compartments in the trunk area.

After Trooper Moyer closed the trunk, he began looking in the grass and weeds next to the vehicle.  Although he had not seen the defendant throw anything out of the vehicle, Trooper Moyer had seen criminal indicators in the vehicle that had made him suspicious.  In addition to the gun and the bloody garments, Trooper

Moyer also saw many air fresheners and seeds of marijuana, both of which are indicators of drugs or drug paraphernalia in a vehicle. Trooper Moyer did not see anything in the grass and weeds.

To the extent that the video shows Trooper Moyer's actions outside the vehicle, the video of the encounter corroborates Trooper Moyer's story of the manner in which he secured the vehicle. The video does not show the inside of the vehicle or the troopers' initial encounter with the defendant. Apparently the camera did not start taping the encounter immediately upon the troopers' arrival; in fact, Trooper Pacella manually turned the camera on approximately one half-hour after the troopers encountered the defendant on Route 80.

The troopers remained at the scene until the tow truck arrived. They remained at the scene both for safety reasons and to ensure the chain of custody of the vehicle. The troopers, with the defendant in the back seat, left the scene at 2:41 p.m., after the tow truck arrived and pulled out the vehicle.

The troopers took the defendant to the police barracks at Rockview. The tow truck also towed the vehicle to the barracks. The vehicle was not searched immediately. Instead, the troopers first requested a canine sniff of the outside of the vehicle. The canine sniff indicated the presence of drugs, upon which the troopers then obtained a search warrant for the vehicle, with Trooper Pacella as the

affiant.  The search produced two plastic bags of methamphetamine with blood on the bags.  These had been secreted in the left rear cargo area underneath a speaker.  On the right side was a grocery bag with $7,200 in U.S. currency.  Documents, including tax records and a Social Security card, were also seized during the search.

Trooper Pacella took the defendant to be "live scanned."  Live scanning involves taking the fingerprints of an individual and electronically sending those prints to the central repository and the FBI to determine if either has a match on file.  In this defendant's case, there were no matching prints on file.  The fact that there was no match meant that the defendant had never been arrested in the United States.  The absence of a match also meant that the troopers were not able to confirm the defendant's identity through the live scanning process.

The troopers also obtained a search warrant for DNA via a Bode Buccal swab from the mouth of the defendant.  The purpose of obtaining a DNA test was to confirm that the blood found in the vehicle matched that of the defendant.

The troopers charged the defendant with drug charges and carrying a firearm without a license, and the complaint and warrant were issued the same day.


**THE PARTIES' POSITIONS:**

## Defendant's arguments

In his brief supporting his motion, the defendant argues that the evidence seized from the vehicle and his person should be suppressed as the evidence is fruit of the poisonous tree resulting from a violation of the defendant's <u>Fourth Amendment</u> rights.  Specifically, defendant argues that no traffic stop occurred. Moreover, defendant argues that the troopers did not have the reasonable suspicion of a crime or probable cause to justify an investigative detention of defendant.  The defendant argues that he was not free to leave when the troopers asked for identification and whether he was in the country legally; therefore, the encounter became custodial.  As a result, statements obtained after that point in time, including the statement that he had overstayed his visa by three months, were obtained without the defendant being given his <u>Miranda</u> rights.  The defendant argues that the troopers' reasons for the detention were merely pretextual and that, under Third Circuit law, such reasons cannot form the basis for reasonable suspicion or probable cause.  Additionally, the defendant argues that the gun should not have been seized as it was not in plain view.  Defendant also argues that the community caretaking exception does not apply, as the troopers searched the car during a criminal investigation.

## Government's arguments

The government argues that the defendant's detention was reasonable, that the troopers lawfully discovered and seized the firearm, and that any admissions made by the defendant were made voluntarily. Specifically, the government argues that questioning the defendant about his identity did not implicate a <u>Fourth Amendment</u> violation. When the troopers developed reasonable suspicions about the legality of defendant's presence in this country, the troopers then detained the defendant for the limited purpose of verifying identity and immigration status. The government also argues that the nature and length of the detention were reasonably related to the circumstances justifying the need for further investigation. The government alleges that discovery of the firearm provided probable cause for the arrest of the defendant.

In the alternative, the government argues that the troopers had probable cause and the authority to arrest the defendant on the summary offense of driving a motor vehicle without a license.

Additionally, the government argues that the firearm was lawfully discovered as it was in plain view during the course of an inventory search. Moreover, the government argues that the firearm, methamphetamine, and cash would have been inevitably discovered because the car was disabled and would have needed to be towed to the station, where an inventory search would have been

conducted.  The government next argues that discovery of the firearm and bloody underwear established the probable cause necessary under the vehicle exception to the warrant requirement for the troopers to search the vehicle without a warrant.

Finally, the government argues that the troopers acted in good faith by obtaining a search warrant for the vehicle supported by independent probable cause.  The government asserts that the canine sniff is not a search for purposes of the <u>Fourth Amendment</u>, and that the canine sniff test provided probable cause for the search warrant.  The government also argues that statements by the defendant were made voluntarily and prior to when the need for <u>Miranda </u>rights was triggered. Additionally, the government argues that the defendant's statements about drugs in the car and of being a "deadman" were unsolicited remarks.

**DISCUSSION:**

### 1.  Initial Questioning of Defendant and Implication of the Fourth Amendment

As the Supreme Court has noted, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions."  <u>Fla. v. Bostick</u>, 501 U.S. 429, 434 (1991); <u>see</u> <u>also</u> <u>Immigration & Naturalization Service v. Delgado</u>, 466 U.S. 210, 216 (1984) (noting "that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a

Fourth Amendment seizure").  If the encounter is a "consensual" one, i.e. if "a reasonable person would feel free 'to disregard the police and go about his business,'" then reasonable suspicion is not mandated.  Id. (citing California v. Hodari D., 499 U.S. 621, 628 (1991)).  As the Supreme Court clarified in Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968), a seizure under the Fourth Amendment will only occur "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ."

In the present case, the troopers did not pull over the defendant, but instead came upon the defendant working under the hood of a red Kia Sportage, which was parked in the center median of Route 80.  After learning from the defendant what he believed was wrong with the vehicle, the troopers asked for the defendant's identification, license, registration, and insurance documentation.  The defendant was able to produce insurance and registration documentation, as well as a Nicaraguan ID card.  Incredulous as to the authenticity of the Nicaraguan ID card, Trooper Moyer asked the defendant whether he was illegal or legal.  According to Trooper Moyer, the defendant responded by looking at the ground and stating that his visa had expired three months before.

In light of the above, the defendant was not seized for purposes of the Fourth Amendment prior to his being handcuffed and moved to the backseat of the patrol

car.  The troopers were permitted to stop and determine whether the defendant required assistance, and the troopers were also permitted to inquire as to the defendant's identity.  A number of factors were relevant in the troopers' reasonable suspicion as to the defendant's illegal presence in the United States: the failure of the defendant to be able to produce a visa or a passport, the questionable authenticity of the defendant's Nicaraguan ID card, the defendant's apparent nervousness around the troopers, and the defendant's admission that he had overstayed his visa by three months.  All of these factors led to the troopers' reasonable conclusion that they should detain the defendant and transport him to the barracks to be live scanned.  The troopers did not question the defendant in violation of his <u>Miranda</u> rights, as they were entitled to question him as to his identification; therefore, his answers to the troopers' questions should not be suppressed.

It is worth noting that, like the factual scenario in <u>Bostick</u>, the facts presented in this case do not fit neatly into a "free to leave" analysis.  <u>See</u> 501 U.S. at 436 (noting that the "free to leave" analysis is inapplicable in a situation where a reason distinguishable from police action is the cause of a restriction in the defendant's ability to leave).  Like the bus passenger in <u>Bostick</u>, defendant Morales-Ruiz's movement was restricted initially not by any police action, but

15

instead by his being stranded because of the disabled vehicle he had been driving.

Therefore, the real issue is "whether a reasonable person would feel free to decline

the officers' requests or otherwise terminate the encounter." Id. In this case, the

troopers merely asked for the defendant's identification, and they did not indicate

to the defendant that he was required to comply. See id. at 437. Defendant, then,

was not seized for purposes of the Fourth Amendment during his initial encounter

with the troopers.

In light of the forgoing, we conclude that the defendant was not seized for

the purposes of the Fourth Amendment until he was placed in handcuffs and

moved to the troopers' patrol car. As such, the troopers' questioning of the

defendant prior to his being handcuffed was proper, and the defendant's answers to

the troopers' questions prior to being handcuffed and placed in the patrol car

should not be suppressed.

## 2. The Mirandizing of the Defendant

In Miranda v. Arizona, 384 U.S. 436, 445 (1966), the Supreme Court

required that, before a law enforcement officer is permitted to ask a suspect in

custody questions, the officer must inform the suspect "that he has a right to

remain silent, that any statement he does make may be used as evidence against

him, and that he has a right to the presence of an attorney, either retained or

16

appointed." Under the <u>Miranda</u> rules, "a statement made by a suspect in response to custodial interrogation after he or she has elected to remain silent is inadmissible at trial." <u>United States v. Brownlee</u>, 454 F.3d 131, 146 (3d Cir. 2006) (citing <u>Miranda</u>, 384 U.S. at 478-79). The <u>Miranda</u> protections apply only "where a suspect in custody is subjected to interrogation." <u>R.I. v. Innis</u>, 446 U.S. 291, 300 (1980).

In the present case, there is no evidence of a violation of <u>Miranda</u>. Upon encountering the defendant on Route 80, the troopers asked the defendant preliminary identification questions, and the defendant's demeanor and answers increased the troopers' suspicions that the defendant might be in the United States illegally. Eventually the defendant admitted that his visa had expired three months before. Upon this admission, the troopers reasonably decided to detain the defendant so as to determine whether the defendant was in fact in the United States illegally. While there is some disagreement as to when the defendant was Mirandized in relation to his statement that he was "a deadman," Trooper Pacella testified that the defendant "blurted out the statement about that he's a deadman and that there were drugs in the car." (Rec. Doc. No. 66 at 118). The defendant's statement, then, was unsolicited; he did not make the statement in response to any police questioning. and the troopers did read him his <u>Miranda</u> rights. Therefore,

the defendant cannot claim that the troopers engaged in custodial interrogation without properly Mirandizing him.

In light of the above, we find that the troopers did not violate the defendant's <u>Miranda</u> rights when they obtained admissions from the defendant while he was handcuffed and in police custody in the patrol car. Therefore, such evidence should be deemed admissible.

### 3. Inventory and Impoundment of the Vehicle and the Resulting Discovery of the Gun and Bloody Garments

The Supreme Court has continued to hold "that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are <u>per se</u> unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." <u>Mincey v. Arizona</u>, 437 U.S. 385, 391 (1978) (quoting <u>Katz v. United States</u>, 389 U.S. 347, 357)). One such exception is the inventory exception, which allows a police officer to conduct "a warrantless inventory search of a legitimately seized vehicle," <u>United States v. Bush</u>, 647 F.2d 357, 370 (3d Cir. 1981), so long as "standardized criteria or established routine," <u>Colorado v. Bertine</u>, 479 U.S. 367, 374 n. 6 (U.S. 1987) form a basis for the inventory. <u>See</u> <u>United States v. Salmon</u>, 944 F.2d 1106, 1120 (3d Cir. 1991). The purpose and effect of an inventory search is "to protect an owner's

property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." <u>Bertine</u>, 479 U.S. at 372.

In the present case, the search of the vehicle conducted by Trooper Moyer was proper under the inventory search exception to the Fourth Amendment. While the search did not take place at the barracks, it did take place at a time when the car was legitimately seized. After all, at the time of the search, the defendant had admitted that he had overstayed his visa by three months; in light of this admission and other relevant factors discussed above, the troopers had a reasonable suspicion that the defendant was in the United States illegally. The troopers also had probable cause to arrest the defendant without a warrant for driving a vehicle without a driver's license, a summary offense, and arguably for violating federal immigration law.

The search by Trooper Moyer that revealed the gun and bloody garments was also conducted pursuant to "standardized criteria" as well as "established routine." The Pennsylvania Motor Vehicle Code provides for a police officer to have removed a vehicle such as that involved in this case, <u>see</u> 75 Pa.C.S. § 3552(c)(4); 75 Pa.C.S. § 3553(a)(1)(ix), and the local troop of the Pennsylvania State Police operated under a special requirement that vehicles parked on Route 80

must be removed.  (Rec. Doc. No. 69 at 24).  The inventory search in this case also served the purposes behind the inventory search: it would help to protect the defendant's property while in police custody; to prevent the property from being stolen, damaged, or misplaced; and to protect the troopers at the scene.  In light of the above, the decision to conduct the inventory search was proper under the circumstances, and the search did not violate the Fourth Amendment.

An additional question is whether the troopers lawfully observed and seized the gun and bloody garments in the vehicle during the inventory search.  The answer to this question is important, as the defendant seeks to suppress these items as unlawfully obtained evidence.  It is settled law that the "plain view" exception is an exception to the warrant requirement.  <u>See</u> <u>Horton v. California</u>, 496 U.S. 128 (1990); <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 465-73 (1971).  For a valid seizure to occur under the plain view exception, three elements must be met.  First, "the officer must not have violated the Fourth Amendment in 'arriving at the place from which the evidence could be plainly viewed.'"  <u>United States v. Menon</u>, 24 F.3d 550, 560 (3d Cir. 1994) (quoting <u>Horton</u>, 496 U.S. at 136)).  Second, the "incriminating character" of the item seized "must also be 'immediately apparent.'"  <u>Horton</u>, 496 U.S. at 136 (quoting <u>Coolidge</u>, 403 U.S. at 466)).  Third, the police officer must possess "a lawful right of access to the object itself."  <u>Id.</u> at

137.

We must conclude that the troopers lawfully observed and seized the gun and bloody garments in the vehicle during the inventory search.  First, the search of the vehicle, though done without a warrant, was lawful under the inventory search exception to the Fourth Amendment.  Second, the "incriminating nature" of the items in plain view, namely the handle of a gun and bloody garments, was "immediately apparent."  Third, after observing the gun, Trooper Moyer had probable cause to arrest the defendant on charges of unlawful possession of a firearm and probable cause to conduct a search of the vehicle.  Therefore, we conclude that the gun and the bloody garments found by Trooper Moyer during his inventory search were lawfully discovered and seized under the plain view exception to the Fourth Amendment.

Even if the search and seizure were improper under the inventory search exception, under Pennsylvania law the troopers were entitled to impound the car under the community caretaking exception to the Fourth Amendment.  The Third Circuit has held that, in the context of the community caretaking exception, the real issue is whether the decision to impound the vehicle was, under the circumstances, reasonable.  See United States v. Smith, 522 F.3d 305, 313 (3d Cir. 2008) (citing United States v. Coccia, 446 F.3d 233, 239 (1st Cir. 2006).  In so holding, the

Third Circuit stated that "the Fourth Amendment cannot be the foundation for an equal protection requirement that the police must have standardized impoundment procedures . . . ." Id. at 315. As such, an impoundment by the police pursuant to their community caretaking function need only be reasonable under the circumstances and need not be conducted pursuant to "standardized impoundment procedures." See id. at 313-15. The community caretaking exception recognizes those functions performed by police other than combating or investigating crime; for example, it "encompasses law enforcement's authority to remove vehicles that impede traffic or threaten public safety and convenience." Coccia, 446 F.3d at 238. In Smith, for example, two individuals were arrested by the police after being stopped in a vehicle. Neither individual was the owner of the vehicle and, because of the area in which the vehicle was located, the police believed it was at risk of being damaged or stolen. Id. at 314. The court in Smith found that impoundment of the vehicle was reasonable.

Like the law enforcement officials in Smith, Troopers Moyer and Pacella arrested an individual who was not an owner of the vehicle. No one remained who could lawfully drive the vehicle and, in any case, the vehicle was disabled. The troopers also believed that, in its current location and condition, the vehicle posed a risk to the safety of motorists on Route 80. Therefore, even if the troopers did not

properly search the vehicle pursuant to the inventory search exception, the impounding of the vehicle was proper based on the community caretaking exception to the Fourth Amendment

In light of the above, the impounding of the vehicle and the inventory search, as well as the discovery of the gun and bloody garments by the troopers, were conducted in conformity with the dictates of the Fourth Amendment. As such, the evidence discovered by the troopers pursuant to the search should be admissible.

### 4. Subsequent Canine Sniff and Search of the Vehicle

The warrants subsequently issued to search the vehicle at the barracks and to take the defendant's DNA via a Bode Buccal swab from the mouth were based upon probable cause. Contrary to the position of the defendant, there was no illegality in the questioning of the defendant, the inventory search of the car, or the seizure of the gun and bloody garments which would taint the subsequently obtained search warrants.

Therefore, first, we conclude that the subsequent warrant to search the vehicle, which was based upon a canine sniff at the barracks, was proper and based upon probable cause. Thus, any evidence derived from the search made pursuant to that warrant, such as the $7,200 in U.S. currency, the two plastic bags of

methamphetamine, and a number of documents, are admissible.  Second, we conclude that the subsequent warrant to take the defendant's DNA via a Bode Buccal swab from the mouth was also based upon probable cause.  Therefore, any evidence derived from that search also would be admissible.

**CONCLUSION:**

Based upon the foregoing, we will deny defendant's "Motion to Suppress Evidence and Dismiss the Indictment."

<u>s/James F.  McClure, Jr.</u>
James F. McClure, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :       No. 4:08-CR-454
                                           :
            v.                            :       (Judge McClure)
                                             :
LEVI DANIEL MORALES-RUIZ,      :
                                             :
          Defendant.                :

**O R D E R**

November 2, 2009

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

Defendant Morales-Ruiz's "Motion to Suppress Evidence and Dismiss the

Indictment" is DENIED.  (Rec. Doc. No. 29).


                     <u>s/James F.  McClure, Jr.</u>
                     James F. McClure, Jr.
                     United States District Judge